UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

D.P. an Infant, by His Mother and Natural Guardian
L.P.,

        Plaintiff,

    v.

JUUL LABS, INC. and PAX LABS, INC.

        Defendants.
------------------------------------------------------------------------x

Civ. Action No.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff D.P, by his mother and natural guardian L.P, and by her attorneys Giskan Solotaroff & Anderson LLP, alleges as follows:

## INTRODUCTION

1. This product's liability action arises out of Defendants' design, manufacturing and distribution of JUUL e-cigarettes and JUUL pods ("JUUL e-cigarettes"), which contain three times more nicotine than is necessary to satisfy the nicotine cravings of an adult smoker and deliver these extreme doses of nicotine in an aerosolized vapor that is intentionally designed to taste like candy.

2. Though purportedly designed for adult smokers, Defendants' marketing of JUUL e-cigarettes, much of which occurred on youth-heavy social media platforms, used imagery that appealed to youth. JUUL use ("JUULing") has become wildly pervasive in middle schools and high schools throughout the United States. D.P., a 15-year-old high school freshman, first tried JUUL e-cigarettes in September 2017. He quickly grew intensely addicted to nicotine. Despite extreme measures taken by D.P.'s parents, including switching high schools, making physical

alterations to their home to deprive D.P. of private areas where he can JUUL, and testing D.P's urine for nicotine on a regular basis, D.P. has been unable to refrain from JUULing. D.P. is severely addicted to nicotine, which has altered his brain physically and chemically, and has put him at risk for a lifetime of life-long health problems, to say nothing of the economic costs of nicotine addiction.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 based on diversity of citizenship of the parties and the amount in controversy exceeding $75,000.

4. This Court has personal jurisdiction over Defendants based on Defendants' marketing and distribution of JUUL e-cigarettes throughout New York State.

5. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 (b)(2) in that a substantial part of the events giving rise to the claim occurred in this district.

## THE PARTIES

6. D.P. and his mother and natural guardian, L.P., are both domiciled in Valley Cottage, New York.

7. Defendant PAX Labs, Inc. ("PAX") is a Delaware corporation, having its principal place of business in San Francisco, California.

8. Defendant JUUL Labs, Inc. ("JUUL") is a Delaware corporation, having its principal place of business in San Francisco, California. JUUL was originally a part of PAX but was spun out as a separate company in 2017. A substantial portion of the conduct cited here occurred while JUUL was a part of PAX.

**ALLEGATIONS OF FACT**

9. The JUUL e-cigarette is a two-piece system that, combined, is about the size and shape of a USB thumb drive. It consists of a rectangular enclosure containing a rechargeable battery and heating element (the "JUUL device"), and a pre-filled pod of JUUL's patented nicotine solution (the "JUULpod"), which slides into the end of the JUUL device. The JUUL e-cigarette is a proprietary system that is incompatible with other e-cigarette components or liquids.

10. When a sensor in the JUUL e-cigarette detects the movement of air caused by suction on the JUUL pod, the battery in the JUUL device activates the heating element, which in turn converts the nicotine solution in the JUUL pod into a vapor consisting principally of nicotine, glycerine, and propylene glycol that is inhaled into the lungs.

11. A light embedded in the JUUL device serves as a battery level indicator. The light embedded in the JUUL device gratuitously lights up in a display of rainbow of colors when the JUUL device is waved around.

12. There are <u>no warnings</u> about the existence of nicotine or the risks of nicotine addiction anywhere on the JUUL products or JUUL packaging. Specifically:

      a. There are no nicotine warnings on the JUUL device;

      b. There are no nicotine warnings on the JUULpods;

      c. There are no nicotine warnings on the JUUL device packaging; and

      d. There are no nicotine warnings on the JUULpod packaging.

A.  **DEFENDANTS DESIGNED A PRODUCT THAT POSES UNPRECEDENTED RISKS OF NICOTINE ADDICTION, AN MANUFACTURED AN EVEN MORE ADDICTIVE PRODUCT THAN THE ONE THEY DESIGNED.**

13. What distinguishes the JUUL e-cigarette from competing e-cigarettes is Defendants' patented nicotine formulation, which is used in every JUULpod.

14. JUUL's nicotine formulation is directly derived from decades of research by cigarette companies seeking to create and foster addiction.

15. JUUL's formulation uses a combination of nicotine salts and benzoic acid—an organic acid—to deliver a palatable dose of nicotine with stronger narcotic effects than a cigarette.

16. The role of organic acids in JUUL's formulation is best explained by a 1973 tobacco company memorandum titled *Cigarette Concept to Assure RJR a Larger Segment of the Youth Market*, which provided that the use of organic acids to alter the pH of an inhaled nicotine product gives the product an "additional nicotine 'kick'" that youth find appealing—i.e., addictive.[1] This kick is the result of increased nicotine absorption associated with altered pH levels.[2]

17. The benzoic acid in JUULpods serves to alter the pH of the nicotine salt in the JUULpods and creates an even more potent nicotine kick than cigarettes. In U.S. patent No. 9,215,895 ("the '895 patent"), assigned to "Pax Labs, Inc." and listing JUUL executive Adam Bowen as an inventor, JUUL details a process for combining benzoic acids with nicotine salts to create an aerosolized nicotine vapor that is more potent than a cigarette.

18. Specifically, the JUULpods' formula is more potent than a cigarette in three

---

[1] 1973 R.J. Reynolds Tobacco Co. memo titled, "Cigarette concept to assure RJR a larger segment of the youth market."
[2] Neal Benowitz et al., *Nicotine Chemistry, Metabolism, Kinetics and Biomarkers*, Nicotine Psychopharmacology, 22-29, Handbook of Experimental Pharmacology, vol 192.

respects: (1) JUUL's formula causes physiologically perceptible amounts of nicotine to enter the bloodstream faster than a cigarette; (2) JUUL's formula causes a higher peak nicotine-blood concentration ("cMax") than a cigarette; and (3) JUUL's formula delivers more total nicotine into the bloodstream than a cigarette.

19.     The following figure from the '895 patent shows that a 4% solution of benzoic acid and nicotine salt, which is the formula used in JUULpods, causes a peak nicotine-blood concentration ("Cmax") of approximately of approximately 15 ng/mL, compared to a Cmax of 11 ng/mL for a Pall Mall cigarette. (To make the figure more readable, JUUL's 4% nicotine benzoate data is highlighted in red, and the Pall Mall data is highlighted in blue.)



20.     As high as the reported nicotine dose reported for JUULpods is, the actual dose is likely far higher. Though the strongest benzoic acid concentration mentioned in the '895 patent is 4% (i.e., 40 mg/mL of benzoic acid), one study tested four flavors of JUULpods and found a

4.5% benzoic acid (44.8 ± 0.6) solution.[3] The study also found that JUULpods contained a concentration of 6.2% nicotine salt (about 60 mg/mL), rather than the 5% nicotine (about 50 mg/mL) advertised.  Because even "a small percentage [pH change from an organic acid] can double, triple, or quadruple the amount of free nicotine available,"[4] these deviations from the '895 patent's formula result in massive variations in the amount of nicotine absorbed into the bloodstream.

**B.   THE JUUL E-CIGARETTES' CANDY-LIKE FLAVORS AND YOUTH-CENTRIC MARKETING EFFORTS, COUPLED WITH DEFENDANTS' SALES PRACTICES, HAVE CREATED A YOUTH ADDICTION CRISIS**

21.    Though the JUUL e-cigarette has been on the market for just over three years, a recent study of more than 1,000 12 to 17-year-olds found that 6.5% admitted to using a JUUL e-cigarette.

22.    Public health authorities, independent studies, and expert witnesses found credible by courts have found that marketing is a substantial contributing factor to youth tobacco initiation.[5]

23.    Ubiquitous advertisements of tobacco products normalize and legitimize youth tobacco use among youth, who are unequipped to grasp the implications of addiction to tobacco. Because youth are particularly susceptible to imagery, tobacco companies preyed for decades on the youth by creating advertising images that exhibit images portraying independence, adventurousness, sophistication, glamour, social inclusion, sexual attractiveness, thinness, popularity, rebelliousness, and being "cool."

---

[3] Pankow JF, et al., Benzene formation in electronic cigarettes, PLoS ONE 12(3): e0173055 (2017). See https://doi.org/10.1371/journal.pone.0173055 (last visited June 4, 2018).
[4] *U.S.A. v. Philip Morris*, Case No. 99-cv-02496, 628 ¶ 1598  (D.D.C. Aug. 17, 2008).
[5] *U.S.A. v. Philip Morris*, Case No. 99-cv-02496, 980-89 (D.D.C. Aug. 17, 2008).

24. Defendants' release of the JUUL e-cigarette in June 2015 was accompanied by a multimillion dollar "Vaporized" marketing campaign. The campaign included a massive 12-screen billboard advertisement over New York's Times Square, and a full spread in Vice magazine, which promotes itself to advertisers, like JUUL, as the "#1 youth media in the world."[6] A few images from that campaign are reproduced below.



25. To the extent that any nicotine or addiction warnings accompanied the Vaporized advertisements, they were relegated to fine print against low-contrast backgrounds.

26. Images from the Vaporized campaign and similar images were broadly and

---

[6] https://upload-assets.vice.com/files/2016/01/15/1452894236compressed.pdf (June 22, 2018)

repeatedly disseminated through Defendants' unusually active social media accounts on platforms frequented by the overwhelming majority of youth in the United States, such as Instagram and Twitter.

27.     On information and belief, JUUL maintains active accounts on most social media platforms, including Instagram, Facebook, and Twitter, where JUUL tweeted nearly 5,000 times in 2017 alone.

28.     As of 2016, 76 percent of American teens age 13-17 used Instagram, 66 percent of teens use Facebook, and 44 percent of teens used Twitter.[7]

29.     A recent study explored the growth of JUUL's sales and its presence on social media platforms.[8] The study found that JUUL grew nearly 700% in 2017 yet spent "no recorded money" in the first half of 2017 on major advertising channels, and spent only $20,000 on business-to-business advertising. Despite JUUL's apparently minimal advertising spending in 2017, the study found a significant increase in JUUL-related tweets in 2017:

30.     On Instagram, the study found seven JUUL-related accounts, including DoIt4JUUL and JUUL.girls, which accounted for 4,230 total JUUL-related posts and had more than 270,000 followers.

31.     In addition to JUUL's explosive growth on individual social media platforms, the study found JUUL products being marketed across social media platforms in an apparently coordinated fashion, including smaller targeted campaigns and affiliate marketing, all of which

---

[7] Associated Press, *Instagram and Snapchat are Most Popular Social Networks for Teens*, http://apnorc.org/projects/Pages/HTML%20Reports/instagram-and-snapchat-are-most-popular-social-networks-for-teens.aspx (Last visited June 22, 2018)
[8] Jidong Huang et al., *Vaping versus JUULing: how the extraordinary growth and marketing of JUUL transformed the US retail e-cigarette market*, TOBACCO CONTROL, http://tobaccocontrol.bmj.com/content/early/2018/05/31/tobaccocontrol-2018-054382 (May 31, 2018)

caused the authors to question whether JUUL was paying for positive reviews and JUUL-related social media content.

32. Though the study could not demonstrate that JUUL paid social media "influencers" or automated twitter accounts to help promote JUUL or its products through social media channels, the authors did cite to a story about a popular YouTube e-cigarette reviewer claiming that JUUL has at least demonstrated a willingness to pay for favorable reviews or other forms of "native" coverage on unrestricted social media platforms.[9]

33. Some Twitter users have reported what appear to be JUUL bots – i.e., software-driven social media accounts that programmatically engage in social media activity to promote some end. Other Twitter users appear to either be bot accounts or native advertisers, in that they have a small number of followers, follow few other users, and post exclusively about JUUL content. See, e.g., @HenrytheJUUL.[10]

34. A significant amount of JUUL-related social media activity arises from manufacturers and sellers of JUUL clothing, JUUL "skins" (decorative vinyl wrappers for JUUL devices), and off-brand nicotine pods that are compatible with JUUL devices. These manufacturers sell JUUL products, including regulated nicotine products, directly through social media sites, auction sites like eBay, and sites without adequate age verification controls. Defendants' apparent failure to protect their intellectual property rights directly benefit them by increasing the amount of exposure JUUL products receive, thereby normalizing the use of JUUL e-cigarettes. The imagery used on JUUL skins demonstrate, at a minimum, that an expansive market exists for youth-oriented JUUL accessories.

---

[9] Ali Conti, *This 21-Year-Old is Making Thousands a Month Vaping on YouTube,* https://www.vice.com/en_us/article/8xvjmk/this-21-year-old-is-making-thousands-a-month-vaping-on-youtube (Last visited June 22, 2018)
[10] https://twitter.com/hennrythejuul (Last updated June 18, 2018)

35. Defendants' intent to market to young non-smokers is apparent from JUUL's manufacturing and sale of JUUL pods in a variety of flavors that have no tobacco cigarette analog, including mango, "cool" cucumber, fruit medley, cool mint, and crème brulee. 86 percent of underage JUUL users report that they most recently used a JUULpod in fruit medley, mango, cool mint, or crème brulee.

36. JUUL's selection of flavors that appeal to teens has a marked effect on e-cigarette adoption by underage "vapers." A national survey found that 81 percent of youth aged 12 to 17 years old who had ever used e-cigarettes had used a flavored e-cigarette the first time they tried the product, and that 85.3 percent of current youth e-cigarette users had used a flavored e-cigarette in the past month. Moreover, 81.5 percent of current youth e-cigarette users said they used e-cigarettes "because they come in flavors I like."[11] The use of attractive flavors foreseeably increases the risk of nicotine addiction, as traditional cigarette product designs aimed at reducing the unpleasant characteristics of cigarette smoke (e.g., addition of menthol to mask unpleasant flavors) have previously been shown to contribute to the risk of addiction.[12]

37. Another peer-reviewed study concluded that "Young adults who use electronic cigarettes are more than four times as likely to begin using regular cigarettes as their nonvaping peers, a new study has found."[13]

38. JUUL e-cigarettes have become a "coveted teen status symbol and a growing problem in high schools and middle schools, spreading with a speed that has taken teachers,

---

[11] See Ambrose, BK, et al., *Flavored Tobacco Product Use Among US Youth Aged 12-17 Years, 2013-2014*, Journal of the American Medical Association, published online October 26, 2015.
[12] See https://www.ncbi.nlm.nih.gov/books/NBK53018/ #ch4.s92
[13] B.A. Primack *et al.*, *Initiation of Traditional Cigarette Smoking after Electronic Cigarette Use Among Tobacco-Naïve US Young Adults*, Volume 131, Issue 4, Pages 443.e1–443.e9, available at https://www.amjmed.com/article/S0002-289343(17)31185-3/fulltext (last visited April 26, 2018).

parents and school administrators by surprise."[14]

39. In a recent New York Times article concerning the pervasiveness of JUUL e-cigarettes among children, see https://www.nytimes.com/2018/04/07/style/the-juul-is-too-cool.html, a Connecticut high school student was quoted as stating "you go to the bathroom … there's a 50-50 chance that there's five guys JUULing."  In the same article, a Kentucky high school student captured some of the appeal of JUUL e-cigarettes to children, "In my opinion it looks like the coolest thing ever. Almost futuristic … It's so small, so easy to hide in the palm of your hand," he said. "And they're rechargeable! I've lost track of the number of people I have found charging their JUULs in class through their laptops."  A high school journalist quoted in the article stated "It's ironic. This product was made to wean addicts off cigarettes, and in reality it's attracting teenagers who would never smoke."

40. The notion that JUUL e-cigarettes are or were intended to wean addicts off cigarettes is a farce of JUUL's creation. Because the JUUL e-cigarette puts more nicotine into the blood than a cigarette, JUUL use is likely to worsen nicotine addictions in smokers.

41. Although framed as a safer alternative to smoking, Defendants' JUUL e-cigarettes and JUUL pods still pose serious health risks to teenage users. According to a 2016 report of the United States Surgeon General, E-Cigarette Use Among Youth and Young Adults: A Report of the Surgeon General, ("Surgeon General Report") besides nicotine addiction itself, the nicotine in JUULs and other e-cigarettes negatively influences adolescent brain development, specifically impairing cognitive, attention, and memory processes and increasing the risk of anxiety disorders and depression. Surgeon General Report at 106-107. Moreover, according to the Surgeon

---

[14] Anne Marie Chaker, *Schools and Parents Fight a JUUL E-Cigaratte Epidemic* https://www.wsj.com/articles/schools-parents-fight-a-juul-e-cigarette-epidemic-1522677246 (June 22, 2018)

General, there is a "potential association [of e-cigarette use] with cardiovascular disease." *Id*. at 101. Finally, the Surgeon General reported that nicotine use increases the risk the adolescent will use other unlawful drugs, *id*. at 106, and several studies have shown that e-cigarette users are more likely to start smoking.[15]

C.     **D.P.'S USE OF JUUL E-CIGARETTES RESULTED IN HIS ADDICTION TO NICOTINE.**

42.    D.P. is a 15-year-old boy who, at the time of the filing of this complaint, was a high school freshman.

43.    D.P. is a talented jazz musician who skies and mountain bikes and is a member of his high school track team. He is skilled at carpentry and loves disassembling and re-assembling various items.

44.    In September 2017, D.P. entered a specialized high school in Rockland County that offers a specialized technology and "green" construction program that permits students to receive a high school diploma and associates degree in six years. D.P. and his parents had specifically chosen this high school because of D.P.'s interest in technology and construction.

45.    Upon entering this school as a freshman, D.P. entered an environment in which JUUL e-cigarettes were pervasive. Students were JUULing on the school bus, in bathrooms, outside school and even in class. D.P. was offered JUUL "hits" throughout the day.

46.    At this point, other than a single occasion when D.P. tried a cigarette while in junior high school, D.P. had never smoked nor used any other nicotine product. D.P. tried a

---

[15] *See e.g.,* https://www.drugabuse.gov/publications/drugfacts/electronic-cigarettes-e-cigarettes (Last updated June 2018)

JUUL offered to him at school and quickly became heavily addicted to nicotine.

47. D.P's addiction had an extreme effect on his behavior. D.P. became withdrawn, anxious, highly irritable and prone to angry outbursts. D.P. also began to perform poorly at school.

48. L.P. and D.P.'s other parents are extremely concerned and have taken serious measures to prevent D.P. from JUULing. They removed him from the specialized high school and moved him to another school (although JUULing is prevalent at the new school as well). They have removed the door from his bedroom and locked parts of their house to deprive D.P. of private places to JUUL. They have instructed school officials to place controls over D.P. so that he is not permitted to go to the bathroom unescorted and have subjected D.P. to regular nicotine urine testing.

49. Yet despite all these measures, D.P. is unable to stop JUULing. Although D.P. has been able to refrain from JUUL use for short periods, he feels what he refers to as "urges" return and become so powerful that he is unable to avoid JUUling even though it subjects him to disciplinary measures at home and at school.

50. As a proximate result of Defendants' misconduct, D.P. is addicted to nicotine, putting him at serious risk for life-long health problems including increased risk of heart disease and stroke, changes in brain functionality that lead to increased susceptibility to anxiety, depression and other addictions, decreased functionality of the endocrine system; heightened risk of cancer; and negative effects on fertility. Health risks aside, D.P. also faces a lifetime of economic losses needed to sustain a nicotine addiction for the remainder of his life.

## FIRST CAUSE OF ACTION
(Products Liability-Defective Design)

51.     Plaintiff alleges and incorporates by reference the allegations contained in the foregoing paragraphs.

52.     Defendants designed, developed, manufactured, marketed, sold and distributed JUUL e-cigarettes.

53.     The JUUL e-cigarettes were expected to and did reach consumers such as D.P. without substantial change in the condition in which they were designed, developed, manufactured, marketed, sold and distributed by Defendants.

54.     By using the JUUL e-cigarettes to inhale JUUL's flavored vapors, D.P. was using the JUUL e-cigarettes for the purpose and manner intended by, or reasonably foreseeable to Defendants.

55.     Defendants knew or should have known that the JUUL e-cigarettes were in a defective condition and not reasonably safe for their intended use.

56.     Defendants knew or should have known that JUUL e-cigarettes were extremely addictive and would result in the user becoming addicted to nicotine and being at risk for serious health problems.

57.     With this knowledge, Defendants designed JUUL e-cigarettes in a defective condition for consumption by the public and by D.P.

58.     Defendants could have designed a safer e-cigarette that would contain far less nicotine or would contain nicotine in a formulation which was less likely to addict its users.

59.     In addition, Defendants could have designed an e-cigarette that was far less likely to appeal to children and other persons not already addicted to nicotine by only offering tobacco flavors and not the candy-like flavorings JUULs did offer.

60. In addition, Defendants could have designed an e-cigarette that did not gratuitously flash rainbow colors when waved around, which had the effect of enticing young users.

61. Instead, Defendants designed JUUL e-cigarettes to deliver high levels of nicotine and in a formulation that was certain to result in JUUL users becoming addicted to nicotine.

62. Further, Defendants offered JUUL e-cigarettes in candy-like flavors which appealed to children and other persons who were not already addicted to nicotine.

63. These defects were a substantial factor in D.P. becoming addicted to nicotine and being at risk for the severe health problems set forth in Paragraph **47** above.

64. Based on Defendants' misconduct, L.P., on behalf of D.P. demands compensatory and punitive damages as set forth below.

## SECOND CAUSE OF ACTION
(Products Liability-Manufacturing Defect)

65. Plaintiff alleges and incorporates by reference the allegations contained in the foregoing paragraphs.

66. According to JUUL's labels, JUULpods are supposed to contain 60 mg/mL of nicotine.

67. According to JUUL's '895 patent, JUULpods are intended to contain 4% benzoic acid by weight.

68. The JUULpods manufactured by Defendants contained more than 60mg/mL nicotine.

69. The JUULpods manufactured by Defendants contained more than 4% benzoic acid.

70. As a result of these manufacturing defects, the already extreme risk of addiction posed by JUUL e-cigarettes was heightened to an extent that increased the already extreme addiction risks the JUUL e-cigarettes posed.

71. These defects were a substantial factor in D.P.'s nicotine addiction and injuries.

### THIRD CAUSE OF ACTION
(Products Liability-Product Defect as the Result of Inadequate Warning)

72. Plaintiff alleges and incorporates by reference the allegations contained in the foregoing paragraphs.

73. The JUUL e-cigarettes manufactured and/or sold by Defendants were further designed defectively because the JUUL e-cigarettes and pods were not labeled with an adequate warning.

74. The lack of an adequate warning label on JUUL device enclosures and on JUULpod enclosures rendered these products defective and not reasonably safe for their intended or foreseeable use.

75. The warning label on JUUL packaging and or/on JUUL's website was inadequate and rendered JUUL e-cigarettes defective and not reasonably safe for their intended use.

76. The warning Defendants place on the JUUL website and on JUUL packaging does not accurately convey the addicting nature of JUUL e-cigarettes. Specifically, the warnings to not inform potential users that JUUL e-cigarettes contain levels of nicotine far higher than cigarettes commonly used at this time and that JUUL e-cigarettes are designed to deliver nicotine in a manner that made it far more likely users would become addicted to it.

77. Moreover, many JUUL users including children such as D.P. were offered hits of JUUL when the e-cigarettes were already opened and separated from the packaging and

therefore the packaging was never seen by D.P. and D.P. did not visit the JUUL website until he had already become addicted to nicotine.

78. This inadequate warning was a substantial factor in D.P. becoming addicted to nicotine and being at risk for the severe health problems set forth in Paragraph **47** above.

79. Based on Defendants' misconduct, L.P., on behalf of D.P. demands compensatory and punitive damages as set forth below.

## FOURTH CAUSE OF ACTION
(Negligent Design and Marketing)

80. Plaintiff alleges and incorporates by reference the allegations contained in the foregoing paragraphs.

81. Defendants had a legal duty to design and market a safer-e-cigarette that would not attract users who were not previously addicted to nicotine. Defendants assumed that duty by announcing in their marketing materials that JUUL e-cigarettes were intended for smokers and Defendants intended to prevent children from using their products.

82. Defendants breached this duty by designing JUUL e-cigarettes in flavors designed to appeal to non-smokers and children such as D.P.

83. Defendants further breached this duty by inadequately regulating the sales of its product, through its own website and through the websites and retail locations of its retailers.

84. Defendants further breached this duty by failing to affix nicotine warning verbiage to JUUL device enclosures.

85. Defendants further breached this duty by failing to affix nicotine warning verbiage to JUULpod cases.

86. Defendants further breached this duty by failing to affix nicotine warning labels to its JUUL device or JUULpod packaging.

87. Defendants further breached this duty by failing to post nicotine warning signs on signage in its retail locations.

88. Defendants further breached this duty by launching the Vaporized campaign, which used imagery enticing to teenagers and contained minimal warnings, if any.

89. Defendants further breached this duty through social media campaigns that reached youth and contained inadequate warnings, if any at all, about the addictive nature of its product.

90. Defendants thereafter caused JUUL e-cigarettes to be shipped from the place of manufacture and caused them to be delivered to a place or point within the State of New York where it was foreseeable that they would be, and were in fact, purchased by the public, including D.P.

91. This inadequate design was a substantial factor in D.P. becoming addicted to nicotine and being at risk for the severe health problems set forth in Paragraph 47 above.

92. Based on Defendants' misconduct, L.P., on behalf of D.P. demands compensatory damages and punitive damages, as set forth below.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff L.P. on behalf of D.P. respectfully requests that this Court grant the following relief:

A. Award Plaintiff compensatory damages in an amount to be determined at trial;

B. Award Plaintiff punitive damages in an amount to be determined at trial;

C. Award Plaintiff attorneys' fees and the costs of this action; and;

D. Such other relief as the Court deems necessary and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all questions of fact raised by the complaint.

Dated: New York, New York
June 14, 2018

                        Respectfully submitted,

                        GISKAN SOLOTAROFF & ANDERSON LLP

/s
By: _____
      Jason L. Solotaroff
      Aliaksandra R. Ramanenka
      217 Centre Street, 6th Floor
      New York NY 10013
      (212) 847-8315

MIGLIACCIO & RATHOD LLP

By:   Esfand Nafisi
      12 H St NE #302
      Washington, DC 20002
      (202) 470-3520

      Attorneys for Plaintiff