```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2
    ------------------------------------x
 3  D.P., an infant by His Mother and
    Natural Guardian, L.P.,
 4
                              Plaintiff,
 5
                              Case No. 18-cv-05758-CS
 6      -vs-
 7  JUUL LABS, INC.,
 8                            Defendant.
 9  ------------------------------------x
10                              United States Courthouse
                                White Plains, New York
11                              February 6, 2019
                                2:30 p.m.
12
13  Before:
              HONORABLE CATHY SEIBEL
14
                                District Judge
15
16  APPEARANCES
17  GISKAN, SOLOTAROFF & ANDERSON, LLP
    JASON LOUIS SOLOTAROFF
18  AMY ROBINSON
    Attorneys for the Plaintiff
19
    GIBSON, DUNN & CRUTCHER, LLP
20  JOSEPH EVALL
    DECLAN THOMAS CONROY
21  AUSTIN SCHWING (Via telephone)
    Attorneys for the Defendant, JUUL Labs, Inc.
22
23
24
25
```

1              THE DEPUTY CLERK:  The Honorable Cathy Seibel

2    presiding.  D.P. v. JUUL Labs.

3              THE COURT:  Good afternoon, Mr. Solotaroff, and

4    Ms. Robinson, and Mr. Evall.

5              MR. EVALL:  Good afternoon.

6              THE COURT:  Am I saying it right?

7              MR. EVALL:  Yes.

8              THE COURT:  And Mr. Conroy, and who is on the phone?

9    Mr. Schwing?

10             MR. SCHWING:  Yes.  This is Mr. Schwing.

11             THE COURT:  Good afternoon.  Everyone can have a seat.

12             Anybody have anything to add that's not covered by the

13   motion papers?

14             MR. EVALL:  Your Honor, yes, I do on behalf of JUUL if

15   I may be heard for a moment?

16             We wanted to apprise the Court of the latest

17   development in the consolidated proceedings before Judge Orrick

18   in the Northern District of California, and that development is

19   that last week the plaintiffs filed their consolidated amended

20   class action complaint, and we wanted to hand up copies of that

21   complaint, which is a Docket Item 82 in the case 18-cv-2499

22   before Judge Orrick, along with Appendix A, which is

23   Document 82-2 in the same case.

24             And I just wanted to take a moment to explain what the

25   relevance of this latest development is if that is okay with

1    Your Honor.

2              THE COURT:  Okay.

3              MR. EVALL:  This new filing informs some of the issues

4    that relate to the motion to transfer, the pending motion before

5    Your Honor, and some of the comments that were made in

6    plaintiff's opposing papers.  And what these new filings show is

7    that there -- as the case is progressing in the Northern

8    District of Illinois, there is even a greater overlap between

9    that case and D.P. in three important areas:

10             One of them is that the plaintiffs here had said that

11   there was only one New York plaintiff in the pending case in

12   California.  They now have a total of 42 plaintiffs, five of

13   which are New York plaintiffs in the consolidated proceedings.

14   Three of the four new plaintiffs do claim that they are addicted

15   to nicotine, and that was one of the issues with the one New

16   York plaintiff, an A.U. plaintiff that had previously been

17   present or already was present, whether it has -- there was a

18   clear allegation of addiction to nicotine; and some of these new

19   New York plaintiffs also specifically allege that they were

20   first offered JUUL products in high school like the plaintiff

21   here.

22             And if I may hand up the papers, I will then just

23   explain a couple of other issues about this new filing.

24             THE COURT:  Okay.

25             MR. EVALL:  May I approach?

```
1              THE COURT:  Yes.

2              MR. EVALL:  Okay.  I have already provided plaintiffs,

3   so here are two copies of the complaint.

4              THE COURT:  Give one --

5              MR. EVALL:  And two copies of the appendix.

6              THE COURT:  Give one to Max.

7              MR. EVALL:  And with respect to the appendix, which is

8   Appendix A, Document 82-2, the individual plaintiff allegations,

9   the letters each refer to a different one of the 42 plaintiffs,

10  and I just wanted to note that the New York plaintiffs are

11  Plaintiff G, Plaintiff O, Plaintiff S, and Plaintiff OO, and the

12  previous New York plaintiff that already in the case is

13  Plaintiff K.

14             The second note about this new filing is that in

15  opposing the motion to transfer, the plaintiffs had

16  characterized the California case as focusing more on a

17  consumer-based relief than damages as is the -- as is this case,

18  but we wanted to make clear that the -- in the consolidated

19  amended class action complaint there are very clear allegations

20  regarding damages related to alleged nicotine addiction such as

21  costs to satisfy the addiction, costs of buying the product

22  to -- as a result of having the addiction, the alleged

23  addiction, and the cost of nicotine cessation treatments just as

24  some examples.

25             The third is that we had outlined in our papers the
```

1 overlap between the four causes of action that are raised in the

2 D.P. complaint and how those claims and issues are also covered

3 in the case pending in the Northern District of California.

4      It's now -- there are now 15 causes of action in the

5 Northern District of California consolidated amended complaints,

6 and I just want to note that the failure to warn is expressly

7 two of the claimed causes of action.  They are causes of action

8 4 and 5.  Design defect are causes of action 6 and 8, and

9 manufacturing defect is cause of action 7.

10      So we raise this because we hope that it addresses any

11 underlying concerning as to whether the proposed consolidated or

12 proposed class action before Judge Orrick would raise the claims

13 and defenses that D.P. seeks here and whether allowing D.P.'s

14 case to proceed here would involve a significant and not

15 necessary duplication of effort with the effort that is being

16 undertaken in connection with the Northern District of

17 California case.

18      So thank you very much for giving us the opportunity

19 to present that.

20      THE COURT:  Mr. Solotaroff?

21      MR. SOLOTAROFF:  Well, Judge, if there was ever any

22 doubt as to the lack of coordination between my -- between me

23 and class counsel, it is exhibited by the fact that I have now

24 looked at this -- I have now seen this document for the past

25 maybe 10 or 15 minutes.  We didn't know that it had been filed.

1  I took a quick look through it, and to me, it doesn't really

2  change things because of the simple fact that it's a class

3  action in California, and claims for personal injury can't be

4  dealt with in a class.  You know, you can't do a class action

5  for a personal injury.  It's, by definition, an individual

6  issue.

7          So I think the problem is, is that if the case gets

8  sent out to California, D.P.'s case could very easily get

9  swallowed up in this big class action, and Judge Orrick could

10 understandably kind of see it as not only the tail that's

11 wagging the dog, but a flea on the tail that's wagging the dog.

12 And so I just don't -- I am concerned that if Your Honor sends

13 the case out there, that -- that it will just delay, you know, a

14 very serious case for, you know, a teenager.

15          And what I thought, a lot of the kind of creative

16 horribles that JUUL trots out in its reply brief is just -- you

17 know, just not real things.  Like, you know, we are not -- we

18 have already said we would coordinate discovery.  We are not

19 going to make anyone, you know, be deposed twice.  The document

20 discovery could be consolidated, and what I thought I would just

21 say very briefly, Your Honor, is that like, if you keep the case

22 here, I predict that Your Honor is going to have to do two

23 things, essentially:  One is decide issues of New York law,

24 meaning, the motion to dismiss and eventually a motion for

25 summary judgment; and two is try the case.

1              Other things will be handled out in California.   If

2    Your Honor wants to kind of have Judge Orrick handle discovery

3    issues, we would be fine with that; but the converse of that is

4    that if you transfer it out there, a family that lives about,

5    you know, 20 miles from the courthouse is going to have to

6    travel 3,000 miles for a trial that they -- you know, that's not

7    what they wanted.  It's not fair.  So that's really all I have

8    to say.

9              THE COURT:  Are the claims -- I am just looking at the

10   new complaint.  The -- so far the -- most of them don't say

11   under what law they are brought.  The ninth claim names a bunch

12   of statutes.  The first eight just say things like fraud,

13   failure to warn, and it's not clear to me just from glancing at

14   it whether that's intended to be California law or New York law

15   or the law of every state.

16             MR. SOLOTAROFF:  Judge, they have taken --

17             THE COURT:  I guess I am asking more Mr. Evall because

18   he spent some time with this.

19             MR. SOLOTAROFF:  Sure.

20             MR. EVALL:  Yeah, my understanding is that Judge

21   Orrick has shown flexibility with respect to how he is treating

22   the actions that are being consolidated in.  I don't think

23   there's been a kind of decision on class action treatment, but

24   that he has shown great flexibility with respect to how these

25   cases are being treated.

1          I don't think that the issue of which law applies has

2   been resolved by any means, and I think that that would be

3   something that D.P.'s counsel would be able to address and raise

4   in connection with the -- in connection with the action, and

5   certainly, the underlying issues are issues that are common

6   issues about whether -- whether it is -- the amount of nicotine

7   that's put into the product is excessive in any way, whether

8   there is a failure to warn or a defective product in connection

9   with that or a manufacturing defect.

10          The claims, the theories behind the complaints in the

11   D.P. action are very similar to the theories that are raised in

12   the consolidated class action complaint.

13          THE COURT:  I am sure you will be taking the position

14   in the Northern District of California that this is not an

15   appropriate class action, and I think it's generally correct

16   that cases like this are not appropriate class actions.  So

17   isn't the likelihood that the California case is not going to be

18   a class action, something that suggests I shouldn't be worrying

19   my head too much about what's going on out there?

20          MR. EVALL:  Well, I can't predict what the ruling will

21   be on class certification, but there is a recognition, there is

22   an agreement between the -- between JUUL and between the

23   attorneys for the plaintiffs.  We submitted that a stipulation

24   that was so ordered by Judge Orrick that cases that are filed

25   and wind up in the Northern District of California should all be

1  consolidated into this one.  So it's a common -- it's about a

2  common and efficient treatment.

3          THE COURT:  Right.  But if somebody filed a case in

4  North Dakota, it wouldn't go to Judge Orrick unless some day

5  there is an MDL.

6          MR. EVALL:  Or we would -- I assume there would be a

7  motion to transfer.

8          THE COURT:  Right.

9          MR. EVALL:  And presumably or hopefully the transfer

10  would be -- would happen, and it would go to the Northern

11  District California and would be consolidated with these case.

12          THE COURT:  So --

13          MR. EVALL:  I would argue --

14          THE COURT:  -- via the device of transfer motions, you

15  will build yourself your own MDL in the Northern District of

16  California without the panel declaring it an MDL.

17          MR. EVALL:  I think it's more than -- it would be more

18  than just an MDL because I think it's -- I think it's sort of

19  cradle-to-grave consolidated treatment of the suits.

20          THE COURT:  It's a sort of?

21          MR. EVALL:  It's -- the suits would be treated

22  together by the same judge throughout their life -- lifetime.

23          THE COURT:  Sounds like Mr. Solotaroff would be okay

24  with that, as long as he could have his trial here.

25          MR. SOLOTAROFF:  I would, Judge.  I mean, it's like

1   what's worse?  I actually -- one of the things that occurred to

2   me -- I don't know if anyone has ever done this before, but if

3   -- if Your Honor would transfer it, I think I saw one case where

4   this was done.  They transferred conditional; that if it gets

5   tried, it gets transferred back.  And, yeah, because the MDL at

6   least -- MDLs make sense because, you know, the part of the case

7   needs to be consolidated gets consolidated, but the trials --

8   and an MDL is usually like a mass tort situation.  They can't be

9   tried together.  They are going to be individual trials so they

10  get tried close to home, which is where they should be tried.

11  So --

12          THE COURT:  What about that, Mr. Evall?  What if

13  Mr. Solotaroff agreed to a transfer for everything except trial,

14  and if the case didn't get resolved short of trial, it would

15  come back to me for trial?

16          MR. EVALL:  Well, on that question I would have to

17  defer to my colleague, Mr. Schwing, who is present on the phone

18  who is handling the case, the consolidated proceedings before

19  Judge Orrick.

20          THE COURT:  Mr. Schwing?

21          MR. SCHWING:  Yeah.  Hi, Your Honor.  I apologize I

22  can't be there.  I had some foot surgery and I won't get into

23  the unfortunate details, but I wish I could be there with you

24  all, and thanks for having me on the phone.  I appreciate the

25  accommodation.

1        THE COURT:  No problem.

2        MR. SCHWING:  You know, we have taken the position

3   that this case ought to be transferred to the Northern District

4   of California for all purposes because we are dealing now with

5   folks from all 50 states.  We have got five different plaintiffs

6   here from New York who are making allegations that are virtually

7   identical to the ones that we are dealing here with -- with the

8   A.U. plaintiff, and we think that Judge Orrick will have to

9   grapple with all the issues that are going to be raised in this

10  case in any event, and therefore it's most efficient to send it

11  out to him and, you know, we are in complete agreement with A.U.

12  and A.U.'s counsel with respect to New York law applying here.

13  So there won't be any fight from us with respect to that.

14        So I do believe that the case should be transferred,

15  especially given that, you know, the first-filed rule precedent.

16  It should be transferred to the Northern District of California

17  for Judge Orrick to handle the matter.

18        If Your Honor is unwilling to do that for some reason,

19  then, you know, I guess our second-best option would be what you

20  are now proposing, which would be that it's transferred to Judge

21  Orrick for sort of, you know, all pretrial purposes and would

22  somehow, you know, I guess remand back to Your Honor, but I

23  think the, you know, the precedent on this issue and all the

24  efficiencies that would be achieved by sending the case to the

25  Northern District of California do suggest that it ought to be

1  transferred for all purposes.

2          THE COURT:  All right.  Well, let me tell you where I

3  come out.

4          The motion is defendant JUUL Labs Inc.'s motion to

5  transfer.  I am taking the following background facts from the

6  complaint and the parties' motion papers.

7          The defendant JUUL is a Delaware corporation with its

8  principal place of business in San Francisco.  JUUL designs,

9  manufactures, advertises and sells its market-leading Electronic

10 Nicotine Delivery System, also known as "ENDS" commonly referred

11 to as e-cigarettes.

12         Plaintiff D.P. and his mother L.P. live in Valley

13 Cottage in Rockland County; and, by the way, I noted -- I note

14 that back in last June plaintiff moved to file the complaint

15 under a pseudonym, and defendants didn't oppose, and I do grant

16 that motion, which is motion number three.

17         Plaintiff alleges that when he entered high school in

18 Rockland County in 2017, JUUL use was ubiquitous at the school.

19 He tried JUULing, quickly became addicted to nicotine, became

20 withdrawn, anxious, irritable and prone to angry outbursts and

21 began to perform poorly at school.  Despite efforts by his

22 parents and intervention from local mental health providers, he

23 has been unable to permanently stop JUULing.

24         Plaintiff filed a complaint on June 26th of last year

25 alleging products liability claims for defective design,

1  marketing defect and failure to warn, as well as a claim for

2  negligent design and marketing.  Plaintiff alleges defendant

3  could have designed a lower-nicotine product less likely to

4  addict users, and the defendant could have not included candy-

5  like flavors and other features designed to appeal to children.

6  He also alleges that the pods contain more benzoic acid than

7  they were intended to; that the product's warning label is

8  inadequate and that the above conduct breached a duty defendant

9  assumed by claiming its product was only for adults who already

10 smoked.

11         Plaintiff's action is one of five, or at least there

12 were five at the time of the briefing, which are currently

13 pending against JUUL; two of which were filed before this one

14 and two of which were filed after.

15         The first was *Colgate versus JUUL*, which is Number

16 18-cv-2499 in the Northern District of California.  It was filed

17 on April 26, 2018, and that's the case assigned to Judge Orrick

18 that we have been talking about.

19         The *Colgate* plaintiffs bring a putative class action

20 alleging now in their most recent consolidated amended class

21 action complaint, which is Document 82 in that docket, 14 claims

22 which sound in false advertising, fraud, unjust enrichment,

23 failure to warn, design defect, negligent misrepresentation,

24 breach of warranty, breach of implied warranty and unfair trade

25 practices.

1        The claims -- I haven't had time to read the new

2   complaint, but in the previous complaint the claims generally

3   arose from defendant allegedly misrepresenting that JUUL

4   e-cigarettes and pods are less addictive than cigarettes and no

5   more addictive than other e-cigarettes.

6        On June 12, 2018, two weeks before plaintiff filed

7   this action, the *Colgate* plaintiffs filed their first amended

8   class action complaint, including -- which added several causes

9   of action, including claims arising from the defendant's

10  products being addictive and having more nicotine and benzoic

11  acid than intended.  As I said, I don't know what new factual

12  grounds there are in the most recent complaint.

13       I do note that the defendant filed a declaration of

14  someone named Danna McKay in conjunction with this motion, and

15  attached to that declaration is the *Colgate* plaintiff's initial

16  complaint.  I am pretty sure, however, they meant to cite to the

17  *Colgate* plaintiff's first amended complaint as evidenced, for

18  example, by the fact that they cite to paragraph 162, which only

19  exists in the first amended complaint, not the original.

20       But I can consider the amended complaint as filed in

21  California because I can consider material outside the pleadings

22  on a motion to transfer, and in any event, I can take judicial

23  notice of the existence of court filings.

24       The *Colgate* plaintiffs did not specify under which law

25  they brought the strict liability claims, but on October 30th of

1  last year, Judge Orrick dismissed the failure to warn claim as

2  preempted, but he denied JUUL's motion to dismiss the design

3  defect and manufacturing defect claims, and in doing so he

4  treated them as brought under California law.  That would be

5  Document 66 in the *Colgate* docket.

6         On May 11th, 2018, the same lawyer who represented the

7  *Colgate* plaintiffs filed a putative class action in Superior

8  Court in California, San Francisco County.  That was called

9  *Cooper*, and its number is 18-566496.  The judge in *Cooper* stayed

10 all proceedings pending resolution in *Colgate*.

11        After plaintiffs filed this action, another group of

12 plaintiffs filed a putative class action against the defendant

13 in the Eastern District of Pennsylvania.  That's called *Viscomi*

14 *versus JUUL*, 18-cv-376, and on October 10th, the same counsel

15 that filed *Viscomi* filed a class action in the Southern District

16 of Florida, called *J.Y. versus JUUL*, 18-cv-14416.  On

17 November 6, 2018, both *Viscomi* and *J.Y.* were transferred to the

18 Northern District of California by stipulation.

19        On November 27th, 2018, the interim class counsel in

20 the *Colgate* case and the defendant stipulated that all

21 subsequently filed class or individual actions against the

22 defendant alleging the same or similar claims as alleged in the

23 complaints in these actions will be consolidated under the

24 *Colgate* case, and Judge Orrick so ordered that stipulation.

25 That's Document 71 in the *Colgate* docket.

1          I presume this stipulation referred to all future

2   actions filed in the Northern District of California as I am

3   sure Judge Orrick did not think he was reassigning to himself

4   cases filed in other courts.

5          Defendant now moved to transfer this case, D.P., to

6   the Northern District of California for consolidation with

7   *Colgate*.  The legal standards are well settled.  Under 28 U.S.

8   Code Section 1404(a), "a district court can transfer a civil

9   action to any other district where it might have been brought,"

10  and, "the determination of whether to grant a change of venue

11  requires a balancing of conveniences which is left to the sound

12  discretion of the district court."  *Forjone versus California*,

13  425 Fed. Appendix 73 at 74, summary order.

14         The inquiry involves two steps:  First the Court must

15  establish whether the case could have been filed in the

16  transferee district, and second, the Court must determine

17  whether the convenience of the parties and interests of the

18  justice favor transfer.  See *Fuji Photo versus Lexar Media*, 415

19  F. Supp. 2d 370 at 373, S.D.N.Y., 2006.  "The party requesting

20  transfer carries the burden of making out a strong case for

21  transfer." *New York Marine versus Lafarge*, 599 F.3d 102 at 114,

22  and must point to "clear and convincing evidence on which the

23  Court can base its decision."  *Lewis-Gursky versus Citigroup*,

24  2015 Westlaw 86575 S.D.N.Y., December 11, 2015.

25         The Court may consider a number of factors in deciding

1  whether a transfer of venue is appropriate, including:  The

2  plaintiff's choice of forum, the convenience of witnesses, the

3  location of relevant documents, and relative ease of access to

4  sources of proof, the convenience of the parties, the locus of

5  operative facts, the availability of process to compel the

6  attendance of unwilling witnesses, and the relative means of the

7  parties.  That's *New York Marine* 499 F.3d at 112.

8          In deciding a motion to transfer, I may consider

9  material outside of the pleadings.  *Garcia versus Pearson*, 2016

10  Westlaw 5921083 at page 4, S.D.N.Y., October 7, 2016.

11          While the movant, "bears the burden of clearly

12  establishing that these factors favor transfer," *Citigroup*

13  *versus City Holding*, 97 F. Supp 2d 549 at 561, S.D.N.Y. 2000,

14  "district courts have broad discretion in making determinations

15  of convenience under Section 1404(a).  *D.H. Blair versus*

16  *Gottdiener*, 462 F.3d 95 at 106.  And "there is no rigid formula

17  for balancing these factors and no single one is determinative."

18  *Indian Harbor versus NL Environmental*, 2013 Westlaw 1144800 at

19  page 5, S.D.N.Y., March 19, 2013.

20          Defendant argues that before I address the Section

21  1404 factors, I should make a threshold decision under the

22  first-filed rule which instructs that "where there are two or

23  more competing lawsuits, the first one should have priority,

24  absent the showing of balance of convenience or special

25  circumstances giving priority to the second."  *Michel versus*

1   *Petco*, 2017 Westlaw 2198962 at page 2, S.D.N.Y., May 18, 2017.

2              "The first-filed rule enables courts to prevent

3   duplicative litigation by adhering to the inherently fair

4   concept that the party who commenced the first suit should

5   generally be the party to attain its choice of venue.  Proper

6   application of the first-filed rule requires that the first and

7   subsequently filed cases have either identical or similarly" --

8   sorry -- "either identical or substantially similar parties and

9   claims." *Wyler-Wittenberg versus MetLife*, 899 F. Supp. 2d, 235

10  at 244, E.D.N.Y., 2012.

11             The presumption in favor of the first-filed suit,

12  however, "is not to be applied in a rigid or mechanical way."

13  *Dornoch Limited versus PBM*, 666 F. Supp. 2d 366 at 369,

14  S.D.N.Y., 2009.  "The first-filed rule is not a hard and fast

15  rule, but rather is subject to the discretion of the district

16  court." *Silverman Partners versus First Bank*, 687 F. Supp. 2d

17  269 at 292, E.D.N.Y. at 2010.

18             Defendant first argues that the same issues are

19  present in both cases, meaning this case and *Colgate*, as three

20  of plaintiff's four causes of action are brought in *Colgate*

21  based on nearly identical underlying allegations, and the fourth

22  cause of action is largely derivative of the first three.

23  Indeed, with this new complaint it seems like all four of the

24  claims brought in this case are now brought in California.

25             Next, defendant argues that *Colgate* and this case

1  feature similar parties because defendant is a defendant in both

2  actions.  Each case has claims on behalf of New York plaintiffs,

3  and D.P. is likely a member of the putative class in *Colgate*.

4  To support its argument defendant cites at pages 12 to 13 of its

5  motion -- of its brief to a number of cases that were

6  transferred pursuant to the first-filed rule where the parties

7  or claims in the second action were not identical to those in

8  the first.  I do not, however, find those cases persuasive, and

9  I do not believe that the first-filed rule is meant to deprive a

10 single plaintiff of his choice of forum where he does not seek

11 class relief and there is no other indication to suggest

12 improper gamesmanship or forum shopping.

13         In this case the only hint of such conduct is that one

14 of the lawyers in *Colgate* is listed on plaintiff's complaint.

15 That fact alone does not suggest gamesmanship to me given that

16 lead counsel here does not appear to be involved in *Colgate* or

17 the other federal cases against JUUL, and because plaintiff

18 represents that that individual, Esfand Nafisi, who has not

19 filed a notice of appearance in this court will not be on the

20 amended complaint, and Mr. Solotaroff apparently wasn't even

21 aware of the consolidated amended complaint filed in *Colgate*.

22 So I don't find that there is some sort of subversive

23 coordination between plaintiffs' counsel.

24         Cases that are filed in different states, pursuant to

25 different state laws, and where resolution of the first suit

1  would not be conclusive of the second are not well suited for

2  application of the first-filed rule.  *Thomas versus Apple-Metro*,

3  2015 Westlaw 505384 at page 4, S.D.N.Y., February 5th, 2015.

4  Yet defendant is asking me to apply the first-filed rule in just

5  those circumstances.  *Colgate* and the instant action were

6  brought by different plaintiffs in different states and pursuant

7  to different state laws, at least in large part; and although I

8  acknowledge that the New York plaintiff in *Colgate* concedes that

9  New York law will apply, but resolution of *Colgate* will not be

10 conclusive of D.P.'s claims.  As far as I can tell, Colgate's

11 strict liability claims are brought only under California law

12 whereas the instant case includes strict liability claims under

13 New York law, and it is, as we have discussed, unlikely that

14 these cases -- that this case is going to be a class action.

15       As defendant has already pointed out in *Colgate*, "each

16 state may make its own reasoned judgment about what conduct is

17 permitted or proscribed within its borders."  That's Document 58

18 in *Colgate* at page 13.

19       So it's still quite fuzzy as to what law is going to

20 govern in California, but it's clear that if Judge Orrick or a

21 *Colgate* jury finds defendant liable or not liable for products

22 liability claims under California law, I or a jury here might

23 come to the opposite conclusion under New York law as to D.P.

24 So to the extent California law is going to govern in *Colgate*,

25 that conclusion would not drive anything here.

1          Further, based on the defendant's motion to strike the

2    *Colgate* plaintiff's class claims, defendant is surely going to

3    oppose a motion to certify a class in *Colgate* on the ground,

4    likely among others, that a nationwide class is unmanageable and

5    can't be certified under Rule 23 as it argued in Document 58.

6          Defendant is simultaneously arguing that D.P.'s claim

7    should be transferred to the Northern District of California

8    because he would likely fall into the *Colgate* class at the same

9    time it's arguing that there should be no such class.  The

10   conflict in these positions suggests, at least at this stage,

11   that there is insufficient overlap between *Colgate* and this case

12   for the first-filed rule to apply.

13         Thus, while the *Colgate* plaintiffs and D.P. make

14   similar factual allegations, the risk of inconsistent rulings is

15   only hypothetical and illusory.  It is simply -- I am sorry,

16   quote, "It is simply a feature of our multidistrict court system

17   that sometimes the same defendant must litigate the same issue

18   in multiple districts." Unquote.  *Charlot versus Ecolab*, 97 F.

19   Supp. 3d, 40 at 64, E.D.N.Y., 2015.  Were defendant's

20   interpretation of the first-filed rule correct, it would almost

21   swallow the function of the multidistrict litigation rules.

22   Indeed, MDLs recognize that similar cases can be filed by

23   plaintiffs all over the country.  There would be no need for

24   MDL, which no district judge can initiate, if similar lawsuits

25   by different plaintiffs were routinely transferred under the

1   first-filed rule.

2          The defendant cites to a number of cases in which the

3   first-filed rule was applied, but I do not find them persuasive

4   here.  As those cases made clear, the first-filed rule is most

5   commonly appropriate where the parties to the lawsuit are

6   identical.  For instance, in scenarios in which the plaintiff in

7   the first action is the defendant in the second action.  *Kellen*

8   *versus Calphalon*, 54 F. Supp. 2d 218 at 221, S.D.N.Y., 1999 or

9   in the context of competing FLSA collective actions, Fair Labor

10  Standards Act collective actions, which threaten to present

11  overlapping classes, multiple attempts at certification in two

12  or more different courts, and complicated settlement

13  negotiations.  *Thomas* at page 4.

14         Indeed -- hold on a second.  Did I give you the whole

15  cite of *Thomas*?  Yes, I did.  That was a reference to *Thomas v.*

16  *Apple-Metro*, which I cited earlier.  Indeed, nearly all the

17  cases that defendant cites either have identical parties,

18  involved competing putative collective claims of wages and hour

19  violations, or both.  See *Wyler-Wittenberg*, 899 F. Supp. 2d at

20  244, which was competing FLSA collective actions where both

21  plaintiffs sought to certify a nationwide collective class.

22  *Tate-Small versus Saks*, 2012 Westlaw 1957709 at page 3,

23  S.D.N.Y., May 31, 2012.  Also competing FLSA collective actions,

24  *Michel* at page 1, which was also competing FLSA collective

25  actions, and they are one named plaintiff and the defendant in

1 both actions were the same.  *Thomas* at page 4, also FLSA

2 collectives; *Oleg Cassini versus Serta*, 2012 Westlaw 844284 at

3 page 3, S.D.N.Y., March 13, 2012 where plaintiff was the

4 defendant and defendant was the plaintiff in the first-filed

5 suit.  *Burns versus County of Nassau*, 337 F. Supp. 3d 210,

6 E.D.N.Y. 2018, which were competing FLSA class and collective

7 actions where the plaintiffs in the second case opted out of the

8 first.

9        The two exceptions among the cases that defendant

10 cited were *Regions Bank versus Wieder & Mastroianni*, 170 F.

11 Supp. 2d 436, S.D.N.Y. 2001 and *Cali versus East Coast Aviation*,

12 178 F. Supp. 2d, 276, E.D.N.Y., 2001.  *Regions Bank* did not

13 include identical parties and was not an FLSA action, but it was

14 a suit for contribution, so the second suit was stayed under the

15 first-filed rule because it would be mooted if the original

16 action were to be dismissed.  170 F. Supp. 2d at 441.

17        In *Cali*, multiple actions were springing up as a

18 result of a single plane crash, so the court transferred the

19 later-filed action to where the first was filed.  178 F. Supp.

20 2d at 293.  This case presents no analogous facts.  Further,

21 defendant relies on *River Road International versus Josephthal*

22 *Lyon & Ross*, 871 F. Supp. 210, S.D.N.Y., 1995, but in that case

23 a party attempted to use the first-filed rule to defeat a motion

24 to transfer, and the first-filed rule argument was rejected by

25 the court.  See 871 F. Supp. at 214 to 15.  The remaining cases

1  defendant cites in its first-filed analysis were not decided on

2  first-filed grounds.

3          Further, defendant's assertions that discovery will

4  overlap in both actions is insufficient for purposes of the

5  first-filed rule.  Even where a significant amount of discovery

6  has been completed in the original case that can be applied to

7  the second case, those similarities alone are not sufficient to

8  find that the two cases are substantially similar.  *Tate-Small*

9  at 3.  This is especially true here, considering that discovery

10  in *Colgate* is still in its early stages and because coordinated

11  discovery procedures can be adequate to address inefficiencies

12  in parallel suits such as these.  *Tate-Small* 3.

13          Defendants rely on two cases from the 1990s suggesting

14  that coordination of discovery can only be attained through

15  transfer, but those cases do not age well.  In both *River Road*

16  *International*, 871 F. Supp at 214 and *Kenwin Shops versus Bank*

17  *of Louisiana*, 1999 Westlaw 294800 at page 4, S.D.N.Y., May 11,

18  1999, the courts expressed concerns about coordinating discovery

19  in cases spread across different districts, but as courts have

20  explained ad nauseam in other contexts, the conveniences of

21  modern communication and transportation ease any burden that

22  litigating this case in New York might impose.  *Licci versus*

23  *Lebanese Canadian Bank*, 732 F.3d 161 at 174.  Where "two cases

24  have been filed, and are likely to proceed on a sufficiently

25  synchronous timetable, such coordination can readily be

1  achieved."  *Anthony L&S versus Doherty*, 2014 Westlaw 83506 at 4,

2  S.D.N.Y., January 8, 2014.  The ease with which parties can

3  share information and communicate mitigates the risk of having

4  to conduct duplicative litigation in both New York and

5  California courts.  Indeed, plaintiff has indicated his

6  willingness to be bound by the discovery schedule and rulings in

7  California.  Accordingly, defendants have not persuaded me to

8  apply the first-filed rule.

9          Without the benefit of that rule, the burden is on the

10 defendant to show by clear and convincing evidence that transfer

11 is warranted.  There is no dispute that this action could have

12 been brought in the Northern District of California in the first

13 instance.  So I will only address the factors relating to the

14 convenience of the parties.

15         The first is plaintiff's choice of forum.  The

16 plaintiff's choice of forum is presumptively entitled to

17 substantial deference, especially if that forum is the

18 plaintiff's home forum.  *Gross versus BBC*, 386 F.3d 224 at 230.

19 Indeed, a plaintiff's choice of his home forum is ordinarily

20 entitled to great deference because it is presumed to be

21 convenient.  *Gross* at 230.  There is no dispute here that this

22 district is plaintiff's home forum, and therefore, his decision

23 to bring the case here is entitled to great deference and weighs

24 heavily in favor of keeping the case here.

25         The next factors are the convenience of witnesses and

1   the availability of process to compel the attendance of

2   unwilling witnesses.  Courts typically regard the convenience of

3   witnesses to be the most important factor in analyzing a motion

4   to transfer venue with the convenience of non-party witnesses

5   given more weight than that of party witnesses.  See *Mohsen*

6   *versus Morgan Stanley*, 2013 Westlaw 5312525 at page 6, S.D.N.Y.,

7   September 23rd, 2013, and *Schauder versus International Knife &*

8   *Saw*, 2003 Westlaw 1961611 at page 3, S.D.N.Y., April 28th, 2003.

9           When weighing this factor, courts must consider the

10  materiality, nature and quality of each witness in addition to

11  the mere number of witnesses in each district.  *Martignago*

12  *versus Miller Lynch*, 2012 Westlaw 112246 at page 5, S.D.N.Y.,

13  January 12, 2012.

14          The analysis also involves consideration of the

15  Court's power to compel attendance of unwilling witnesses as a

16  district court can only subpoena witnesses in or within

17  100 miles of the district.  *Mohsen* at 6, see Federal Rule of

18  Civil Procedure 45.

19          "When a party seeks to transfer on account of the

20  convenience of witnesses under Section 1404(a), he must clearly

21  specify the key witnesses to be called and must make a general

22  statement of what their testimony will cover." *ESPN versus*

23  *Quiksilver*, 501 F. Supp. 2d 582 at 550, S.D.N.Y., 2008.

24          Defendant argues that the majority of witnesses will

25  come from the Northern District of California and that the,

1    quote, "expansive list of San Francisco-based JUUL Lab's

2    witnesses notably includes JUUL's co-founder and chief

3    technology officer, vice-president of sales strategy, chief

4    quality officer, chief product officer, director of compliance,

5    risk mitigation and branch protection, head of scientific

6    affairs, director of consumer insights, executive director of

7    marketing and chief sales officer." Unquote.  That's from the

8    defendant's brief at 15.

9            This argument misses the mark.  First, defendant fails

10   to provide a general statement of what the testimony of these

11   witnesses will cover.  Second, while testimony from witnesses at

12   defendant's corporate headquarters in California will

13   undoubtedly be important, see *Martignago* at 6, the convenience

14   of such witnesses is not dispositive because the employee of an

15   employer involved in the litigation is considered available to

16   any venue due to the employer/employee relationship.  See *SBAV*

17   *versus Porter Bank Corp.*, 2013 Westlaw 3467030 at page 8,

18   S.D.N.Y., July 10, 2013, and *Medien Patent versus Warner*

19   *Brothers*, 749 F. Supp. 2d 188 at 191, S.D.N.Y., 2010.

20           Defendant has not identified witnesses who would be

21   significantly inconvenienced or who the Court would be unable to

22   compel to testify in this district if the case is not

23   transferred.  Its arguments that its executives might leave are

24   hypothetical.  By contrast, plaintiff suggested that he will

25   rely on his teachers, doctors and friends, all of whom are third

1  parties and are located in this district.  Therefore, defendant

2  has failed to establish that this factor weighs in its favor.

3  See *American Eagle versus Tala Brothers*, 457 F. Supp. 2d 474, at

4  478 to 79.

5          The next factors are the location of relevant

6  documents and the relative ease of access to sources of proof.

7  Defendant argues that the majority of relevant documents are in

8  the Northern District of California at its headquarters.  The

9  location of documents and records, however, is not a compelling

10 consideration when records are easily portable.  *Mohsen* at 6.

11 See also *Morris versus Ernst & Young*, 2012 Westlaw 3964744 at

12 page 4, S.D.N.Y., September 11, 2012.  Where the court said that

13 "the location of relevant documents is a largely neutral factor

14 in today's world of faxing, scanning and emailing."  Defendant

15 has "failed to cite specific evidence located in the Northern

16 District of California that would be difficult to transfer to

17 New York."  See *Lewis versus C.R.I.,* 2003 Westlaw 1900859 at

18 page 3, S.D.N.Y., April 17, 2003.

19         Because the defendant has not shown a burden on

20 document production absent a transfer, "its assertion that the

21 documents are located in the transferee forum is entitled to

22 little weight."  *Flood versus Carlson Restaurants*, 94 F. Supp.

23 3d 572 at 578, S.D.N.Y., 2015.  I therefore conclude that this

24 factor is neutral.

25         The next factor is the convenience of the parties.

1   The starting point in assessing this factor is the residence of

2   the parties or their principal place of business and location of

3   their offices.  See *Royal & Sun Alliance Insurance versus Nippon*

4   *Express*, 2016 Westlaw 4523885 at page 4, S.D.N.Y., August 18,

5   2016, and *Freeman versus Hoffman-La Roche*, 2007 Westlaw 895282

6   at page 2, S.D.N.Y., March 21st, 2007.  "The convenience of the

7   parties does not favor transfer when it would merely shift any

8   inconvenience from defendant to plaintiff."  *Kiss My Face versus*

9   *Bunting*, 2003 Westlaw 22244587 at 3, S.D.N.Y., September 30,

10  2003.  Defendant's argument essentially asks the Court to do

11  just that:  Shift the burden of travel from defendant to

12  plaintiff, who lives in this district.  Simply because defendant

13  is offering to pay for plaintiff's travel for trial does not

14  change my analysis, as the cost of travel is not the only burden

15  on plaintiff if I send this case thousands of miles from his

16  home.

17          I acknowledge that having to litigate this case in New

18  York will burden the defendant, but shifting that burden to

19  plaintiff is not appropriate, and so I considered this factor

20  neutral.

21          The next factor, "the locus of operative facts is a

22  primary factor in evaluating a motion to transfer because it

23  helps the court identify the suit's center of gravity and thus

24  where it should properly proceed."  *Spiciarich versus Mexican*

25  *Radio*, 2015 Westlaw 4191532 at page 6, S.D.N.Y., July 10, 2015.

1          Defendant argues the center of gravity is in

2   California because, quote, "the operative facts behind the

3   design, manufacture and marketing of JUUL e-cigarettes and

4   JUULpods occurred," unquote, in California.  That's from

5   defendant's brief at 15 to 16.

6          I have questions about what the phrase, quote, "the

7   operative facts behind the design, manufacture and marketing,"

8   unquote, means.  If the actual design, manufacturing and

9   marketing of JUUL products was done in California, I am not sure

10  why defendant didn't just say that.  The way the defendant words

11  its argument suggests that the actual design, manufacturing and

12  marketing may not have occurred in California.

13         Further, according to the defendant, the executives

14  who it says will testify either work in San Francisco or visit

15  there on a regular basis, suggesting that the defendant has high

16  level offices outside of San Francisco.  Plaintiff argues that

17  operative facts occurred in both districts because he bought

18  JUUL products in New York, became addicted to nicotine through

19  JUUL use in New York, and suffered injury in New York, and thus

20  this factor does not weigh in favor of transfer.

21         On the record here, I cannot say the center of gravity

22  of plaintiff's action is in California, and the factor is thus

23  neutral in my analysis.  Further, even assuming this factor

24  favored the defendant, it would not tip the outcome.

25         The next factor is the relative means of the parties.

1   Defendant is a multibillion dollar company.  Plaintiff asserts

2   that he comes from a middle class family, and we have no reason

3   to disbelieve that, so this factor militates against transfer.

4           Familiarity with governing law is the next factor.

5   It's generally given little weight in federal court.  *Flood*, 94

6   F. Supp. 3d at 580.  Judge Orrick and I are both familiar with

7   product liability laws, and we can certainly become familiar

8   with the laws of the other jurisdiction.  Generally courts in

9   New York are more familiar with New York substantive law than

10  courts outside of New York.  *Flood* 580.  So this factor weighs

11  slightly in favor of keeping the case here, but not very much.

12          The last factor is trial efficiency and the interests

13  of justice.  That's based -- "The Court's consideration of those

14  factors is based on the totality of the circumstances and

15  relates primarily to issues of judicial economy."  *Dickerson*

16  *versus Novartis*, 315 F.R.D. 18 at 32, S.D.N.Y., 2016.

17          Another "factor traditionally considered in deciding

18  whether transfer is warranted in the interests of justice is

19  whether related litigation can be consolidated by transfer to a

20  single forum."  *Liberty Mutual versus Fairbanks*, 17 F. Supp. 3d,

21  385 at 397, S.D.N.Y. 2014.  See also *Everlast versus Ringside*,

22  928 F. Supp. 2d 735 at 747, S.D.N.Y. 2013, and *Fuji Photo versus*

23  *Lexar Media*, 415 F. Supp. 2d 370 at 376, S.D.N.Y. 2006.

24          While some courts in this circuit have found that

25  judicial economy is a relevant consideration, but "insufficient

1  on its own to support transfer," *In Re:  Nematron Corporation*

2  *Securities Litigation*, 30 F. Supp. 2d 397 at 407, S.D.N.Y. 1998

3  collecting cases, others have found that "the interests of

4  justice component may be determinative in a particular case even

5  if the convenience of the parties and witnesses might call for a

6  different result."  *Cali* at 295.

7          Defendant argues that plaintiff's case must be

8  transferred to serve judicial economy and the interests of

9  justice and that failure to do so will result in duplicative and

10  inefficient litigation efforts and potentially inconsistent

11  rulings.  This case and the California cases will require much

12  of the same discovery of defendant, and it will be wasteful if

13  the same witnesses are repeatedly deposed.  I understand the

14  risks of which defendant is wary and acknowledge that they favor

15  transfer, but those risks may be mitigated.  The *Colgate* case is

16  still in its early stages, and "coordinated discovery procedures

17  may be adequate to address the inefficiencies in parallel suits

18  such as" this case and *Colgate*.  *Tate-Small* at 3.

19          Further, because it's not clear that Colgate's

20  necessarily going to include New York claims that duplicate the

21  ones here, the risk of inconsistent rulings is still only

22  hypothetical.  Accordingly, trial efficiency and the interests

23  of justice favor transfer, but not so much that this factor will

24  drive the decision.

25          Of the eight factors discussed above, three favor

1   plaintiff, one favors defendant, and the remaining four are

2   neutral.  Of those factors, I afford the most weight to

3   plaintiff's choice of home forum and the convenience of

4   witnesses.  I find that any issues regarding judicial economy

5   that favor transfer can be mitigated by coordinated discovery,

6   and even motion practice if there end up being duplicative

7   claims.  Accordingly, I find the defendant has not met its

8   burden to establish by clear and convincing evidence that

9   transfer is warranted, and the motion to transfer is denied.

10          What I think should happen now is the parties should

11  work on some sort of hopefully stipulations they can agree on

12  regarding the coordination of the discovery with the California

13  case.

14          I am guessing Mr. Solotaroff probably won't mind if

15  the lawyers out there take the laboring oar on discovery of the

16  defendants, but -- and I gather, correct me if I am wrong,

17  Mr. Evall, that there is not yet a scheduling order for

18  discovery in place in California?

19          MR. EVALL:  That is my understanding.

20          And, Your Honor, we are also going to -- though we

21  discussed at the last conference -- the motion to dismiss the

22  complaint pursuant to 12(b)(6).  I'm scheduled for that.

23          THE COURT:  Oh, I forgot about that.

24          MR. EVALL:  And --

25          THE COURT:  You sure you want to do that when you just

1  had a really smart judge in California deny what I assume was

2  going to be a pretty similar motion?

3          MR. EVALL:  Well, Your Honor, we actually -- the

4  discussion was that plaintiffs had indicated that based on the

5  issues that we had raised in our letter, that -- well, I think

6  they said that we have a -- actually, a well-founded argument or

7  something like that.

8          MR. SOLOTAROFF:  Hold on.  That's not -- I just said

9  compared to the motion to transfer, and now I am feeling pretty

10 good about what I said.

11         THE COURT:  Well, look, you know, as soon as I hear

12 "transfer," my immediate thought is, yes, let me get rid of this

13 case because busy district judges like to get rid of cases, but

14 then when I looked at all the factors, on balance, it came out

15 plaintiff's way; and I do think the one factor that would have

16 pushed me the other way or could have pushed me the other way

17 can be easily addressed.

18         I am happy to -- of course I will entertain the motion

19 to dismiss, but I still think that the parties should, at least

20 once discovery gets going in California, this case should be

21 tagging along with it even if I haven't decided the motion to

22 dismiss yet because if I deny the motion, and then this case

23 starts discovery, we will have missed the boat on some of what's

24 going on in California.

25         When would you like to make the motion to dismiss,

1   Mr. Evall?

2          MR. EVALL:  The threshold question I have is:  Your

3   Honor had discussed at the last conference a procedure whereby

4   plaintiffs would have the option of filing an amended complaint,

5   and then we would move with respect to that.

6          THE COURT:  Right.  I -- that is how I ordinarily do

7   it.  I can't remember.  I should have refreshed my recollection.

8          Did you want to amend, Mr. Solotaroff, now that you

9   know what their motion is going to look like?

10         MR. SOLOTAROFF:  Judge, what I said when we were last

11  all together was that -- that it's a little difficult to make

12  that call based just on the pre-motion letter because it's, by

13  requirement of the page limitations, you know, a little cursory

14  and so --

15         THE COURT:  Yes.

16         MR. SOLOTAROFF:  -- I had, you may remember now, but I

17  had suggested another process which you had indicated is what

18  your colleague next door does, which is, let them make the

19  motion, and then I can decide whether to amend.  And in all

20  candor, I think Your Honor was not convinced to change her way

21  that she usually does things just because I suggested it.

22         It's still my preference, but if -- what I would like

23  to do if you wanted me to decide now, if I could have 30 days to

24  decide whether to amend or not, and then --

25         THE COURT:  Yes.  I mean, I think I will do it my way,

1    but that doesn't preclude you from saying in your opposition

2    that whatever they have raised can be cured by amendment.  I

3    don't think it's -- oftentimes the pre-motion letters do give

4    the plaintiff enough information that they are able to add facts

5    that do address the defendant's argument, and then, at the very

6    least, it narrows some of the issues on the motion.  Sometimes

7    plaintiff goes to amend with what the defendant says in mind and

8    does some homework and realizes, oh, I can't really pursue that

9    claim.

10          So doing it my way, as opposed to my neighbor's, I

11   think sometimes does narrow the issues that I have to decide,

12   which is always nice; but even if it doesn't, if you then get

13   the defendant's papers, and you have an aha moment, and you

14   realize, oh, I can fix this by amending, then you should say

15   that in your opposition.  I am not going to -- you know, I don't

16   have a hard and fast rule that there can't be another amendment.

17          So amended complaint, if there is going to be one, in

18   30 days.  30 days is March 8th.

19          How long after that, Mr. Evall, would you like to make

20   the motion?

21          MR. EVALL:  Can we have four weeks, Your Honor?

22          THE COURT:  Yes.  That would take us to April 5th.

23          How long for your opposition, Mr. Solotaroff?

24          MR. SOLOTAROFF:  Another four weeks, Judge?

25          THE COURT:  That would take us to May 3rd.

1          And reply?

2          MR. EVALL:  Could we have two and a half weeks, Your

3   Honor?

4          THE COURT:  Sure.  That would take us to May 22nd.

5          I can't remember if I spoke to you about bundling in

6   connection with the motion papers for the motion to transfer.

7   That is an option that I offer.  I don't require it.  What I

8   mean by that is you serve each other on the dates we have set,

9   but you don't file anything until the date the reply is due.  I

10  offer you that option because it allows me to be more generous

11  with extensions of time should anybody need one; and the reason

12  for that has to do with the dreaded six-month list, which every

13  six months requires me to confess my sins and tell the world if

14  I have had any motions lying around for six months.  Six months

15  starts around from when the motion is filed.  If you file it on

16  April 5th, and then either plaintiff for his opposition or

17  defendants for reply needs extra time, I am going to be

18  reasonable, but I may not be generous because it's coming out of

19  my six months.

20         MR. SOLOTAROFF:  So let's bundle, Judge.

21         THE COURT:  If you bundle, I will be generous because

22  it's not coming out of my six months, but only if both sides

23  want to bundle should you do it, and if both sides agree to it

24  and you end up having to write me a letter saying, can we have

25  more time, remember to put in the letter that you have agreed to

1  bundle so I know to review it, not just with my reasonable hat

2  on, but with my generous hat on.

3          I don't require bundling.  It's an option for the

4  parties if you like the idea.

5          MR. EVALL:  Yeah, I -- we agree as well that we should

6  bundle.  I am sure we can work together on that.

7          THE COURT:  And if -- I probably won't remember,

8  though, so if you do need to write me a letter, put it in the

9  letter.

10         And I will put you, Mr. Evall, in charge of monitoring

11 what's going on in California, and once they are starting to

12 talk about a scheduling order, you guys should talk about some

13 sort of order I can enter here, which will essentially

14 coordinate discovery with California so that there isn't a lot

15 of overlap or wasted time on anybody's part.

16         All right.  Anything else we should do this afternoon?

17         MR. SOLOTAROFF:  Thank you, Judge.

18         MR. EVALL:  Your Honor, thank you very much.

19         THE COURT:  Thank you all.

20         (Time noted:  3:50 p.m.)

21

22

23

24

25